E-FILED
Monday, 05 February, 2007 02:58:22 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| BENJAMIN MILLER and KATHERINE MILLER, <br><br> Plaintiffs, <br><br> v. <br><br> AMERIQUEST MORTGAGE COMPANY, AMERIQUEST MORTGAGE SECURITIES, INC., AMC MORTGAGE SERVICES, INC., DEUTSCHE BANK NATIONAL TRUST COMPANY, N.A., AMERICAN FAMILY PROPERTY SERVICES, and DOES 1-5, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**FILED**

**FEB 5 2007**

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**JURY DEMANDED**

## COMPLAINT

### INTRODUCTION

1.    Plaintiffs Benjamin Miller and Katherine Miller bring this action against a "subprime" mortgage lender to secure relief, including rescission, for violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226, and the Equal Credit Opportunity Act, 15 U.S.C. §1691 et seq. ("ECOA"), and to recover damages under state law.

### JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (general federal question), 1337 (interstate commerce), and 1367 (supplemental jurisdiction), and 15 U.S.C. §§1640 (TILA) and 1691e (ECOA).

3.    Defendants do business in the District and are deemed to reside here.

Venue is therefore proper under 28 U.S.C. §1391(c).

## PARTIES

4.      Plaintiffs Benjamin Miller and Katherine Miller are husband and wife and own and reside in a single family home located at 9 Hackney Lane, Springfield, IL  67202.

5.      Defendant Ameriquest Mortgage Company ("Ameriquest") is a foreign corporation which maintains offices in and does business in Illinois.  Its registered agent and office are National Registered Agents, 200 W. Adams, Chicago, IL 60606.

6.      Defendant Ameriquest Mortgage Company is engaged in the business of originating "subprime" mortgages.

7.      Defendant Ameriquest Mortgage Company makes more than 26 loans per year.

8.      Defendant Ameriquest Mortgage Company is a "creditor" as defined in TILA and Regulation Z.

9.      During 1999-2003, Ameriquest was the third largest subprime lender by volume, with $61.8 billion in total originations during the period.  Ameriquest is the largest "direct to consumer" subprime mortgage originator in the United States.  During the first half of 2004, Ameriquest originated over $16 billion in loans, representing a 76% rise over the same period in 2003.

10.      Defendant AMC  Mortgage Services, Inc., ("AMC") is a foreign corporation which does business in Illinois. It is an affiliate of Ameriquest.   Its registered agent and office are National Registered Agents, Inc., 200 W. Adams, Chicago, IL 60606.

11.      Defendant AMC Mortgage Services, Inc., an affiliate of Ameriquest

2

Mortgage Company, services loans originated by Ameriquest Mortgage Company, and claims an interest in such loans, including the right to receive payments thereunder. It is joined as a necessary party.

12.    Defendant Ameriquest Mortgage Securities, Inc., an affiliate of Ameriquest Mortgage Company, is a foreign corporation which transacts business in Illinois. It holds legal title to loans originated by Ameriquest Mortgage Company. It is located at 1100 Town & Country Road, Suite 1100, Orange, CA 92868.

13.    Defendant Deutsche Bank National Trust Company, N.A., is a federally chartered bank located at 60 Wall Street, New York, NY. On information and belief it holds legal title to plaintiff's loan, probably as trustee.

14.    Defendant American Family Property Services, Inc., is an Illinois corporation. Its registered agent is Lee D. Garr and its registered office is 50 Turner Ave, 2nd Floor, Elk Grove Village, IL 60007. It is engaged in the business of appraising properties.

### FACTS RELATING TO PLAINTIFFS

15.    Prior to June 30, 2004, plaintiffs applied for a mortgage with Ameriquest Mortgage Company.

16.    Plaintiffs needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

17.    Prior to June 30, 2004, Ameriquest arranged for an appraisal of plaintiffs' house and property. Ameriquest arranged for American Family Property Services, Inc., to perform the appraisal.

18.    Todd L. Lash performed the appraisal at plaintiffs' residence on or

3

about June 3, 2004 and prepared the written appraisal on June 8, 2004. Exhibit I.

      19.     According to Mr. Lash's report, the appraised value of plaintiffs' home at the time was $172,000. Exhibit I.

      20.     At the closing, Ameriquest charged plaintiffs $999.00 for an appraisal.

      21.     The loan was closed on June 30, 2004. The principal amount of the loan was $154,800 or 90% loan-to-value ratio ("LTV").

      22.     On October 24, 2005, plaintiffs took out a home equity loan for debt consolidation purposes with Beneficial Mortgage Company of Illinois. Plaintiffs took out a $21,000 loan , relying on Ameriquest's appraisal of their home.

      23.     In June 2006, plaintiffs attempted to refinance with American Home Mortgage. American Home Mortgage denied plaintiffs application, stating that their appraised value came out too low with a 132% LTV. Exhibit J. Plaintiffs were not aware that their house had been over-appraised until this time.

      24.     On information and belief, Ameriquest conspired with American Family Property Services, Inc., to produce a fraudulent inflated appraisal, for the purpose of increasing the loan amount plaintiffs' would qualify for, which ultimately increased the lender's profits. Plaintiffs have been unable to refinance because of Ameriquest and American Family Property Services, Inc., overappraisal of plaintiffs' home.

      25.     Plaintiffs loan amount of $154,800  has resulted in an unacceptable high LTV ratio.

      26.     The following are documents  relating to the loan:

          a.     A note, Exhibit A. Only Benjamin Miller signed the note.

       b.  A mortgage, <u>Exhibit B</u>. Both Benjamin Miller and Katherine

Miller signed the mortgage.

       c.  A settlement statement, <u>Exhibit C</u>.

       d.  A Truth in Lending disclosure statement, <u>Exhibit D</u>.

       e.  The official Federal Reserve Board notice of right to cancel,

<u>Exhibit E</u>. All copies of <u>Exhibit E</u> furnished to plaintiffs were incomplete, as indicated.

       f.  A different, "one week" (actually six days) notice of right to

cancel, <u>Exhibit F</u>.

       g.  An "itemization of settlement charges," <u>Exhibit G</u>.

       h.  A list of "items to be paid off from loan proceeds," <u>Exhibit H</u>.

   27.  Plaintiffs were later directed to make payments to AMC Mortgage

Services.

   28.  On information and belief, Ameriquest Mortgage Securities, Inc., owns

plaintiffs' loan and Deutsche Bank National Trust Company, N.A. holds title to it.

   29.  In the event Ameriquest Mortgage Securities, Inc., does not own plaintiffs'

loan or Deutsche Bank National Trust Company, N.A. does not hold title, the owners are named

as Does 1-5.

   30.  Applicable statutes of limitations have been tolled as a result of the

inclusion of plaintiffs in class actions that are part of MDL 1715 and stipulations therein.

<div align="center"><strong><u>COUNT 1 – TRUTH IN LENDING ACT</u></strong></div>

   31.  Plaintiffs incorporate paragraphs 1-30. This claim is against all

defendants except American Family Property Services, Inc.

<div align="center">5</div>

32.    In order to give consumer borrowers the opportunity to rethink transactions that would put the titles to their homes at risk, the Truth in Lending Act gives home owners who refinance their mortgages with a new lender the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or three days of receiving notice of their right to rescind, whichever is later.  More specifically, the statute, provides that:

> **Except as otherwise provided in this section, in the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this title, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so.**  (15 U.S.C. § 1635(a)).

33.    To ensure that rescission is a viable option, the statute also provides that if the customer elects to rescind, the customer is entitled to the return of all money or property that the customer has given as part of the credit transaction.  More specifically, the statute provides:

> **When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such rescission.  Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.**  (15 U.S.C. § 1635(b).)

34.    To ensure that home owner borrowers are aware of these rights, the statute requires lenders to disclose rescission rights to customers clearly, conspicuously and accurately.  More specifically, the statute provides:

6

violation of 15 U.S.C. §1635 and 12 C.F.R. §226.23, for (without limitation) the following reasons:

### Incomplete Notices

38.    The official Notice of Right to Cancel forms delivered to plaintiffs did not set forth the date the rescission period expired, a violation of 12 C.F.R. § 226.23(b)(1)(v).

### Notices Confusing Where Less Than All Owners Are Obligated

39.    Exhibit E is inherently confusing with respect to who has a right to cancel in a case in which less than all of the persons signing the mortgage sign the note. The confusing portions were added by Ameriquest to the official Federal Reserve Board text.

40.    The top of Exhibit E has only Benjamin Miller's name on it, and is addressed to "borrower(s)." The text is addressed to "You," which is reasonably interpreted as applying to the individual whose name appears directly above. The bottom of the form states that "Each borrower" has the right to cancel, which is reasonably interpreted as meaning the persons named as "borrower(s)" at the top of the document. While there are signature lines for both plaintiffs at the bottom of the form, they are there described as "Borrower/ Owner," which presumably means something different than just "borrower."

41.    The statute gives not only each person obligated to repay the loan but each person who resides in and has an ownership interest in the property the right to cancel, and requires a notice that unequivocally tells each such person that they have the right to cancel.

### "One Week" Form

42.    The delivery of two different notices of right to cancel is confusing and obfuscatory, resulting in lack of clear and conspicuous disclosure of the right to cancel.

8

43.    Further, the "one week" cancellation notice is misleading, as the period given is actually only six days long.  Ameriquest's own personnel found this confusing, and were issued a "job aid" at the beginning of each month listing the expiration dates for the official and "one week" cancellation notices for loans closed each day during the month.

44.    Finally, the "one week" notice contains the same ambiguous and confusing references to "borrower" and "owner" as defendants' version of the official Federal Reserve Board three-day notice.

45.    Notice of rescission has been given to defendants.  A copy is attached as Exhibit K.

46.    The loan has not been rescinded.

47.    Under 15 U.S.C. §1641(c), the right to rescind may be exercised against any assignee.

48.    15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiffs and against defendants for:

a.    A judgment voiding plaintiffs' mortgage, capable of recordation in the public records, and binding on defendants;

b.    Statutory damages for the underlying disclosure violation;

9

c.      If appropriate, statutory damages for failure to rescind;

d.      Attorney's fees, litigation expenses and costs; and

e.      Such other or further relief as the Court deems appropriate.

### COUNT II – EQUAL CREDIT OPPORTUNITY ACT

49.      Katherine Miller incorporates paragraphs 1-48.

50.      This claim is against Ameriquest Mortgage Company.

51.      On information and belief, the majority of the instances in which less than all owners of the property sign a note in favor of defendant are where a husband and wife own the property and only the husband signs the note.

52.      On information and belief, it is defendant's practice, if the wife does not have an income and/or her credit score is no better than the husband's, to prepare the loan documents in this manner.

53.      Defendant's practice thus impairs and obfuscates the cancellation rights of women, and married women particularly, because of their gender and marital status, in violation of the ECOA's prohibition against discrimination on such bases.

WHEREFORE, plaintiff Katherine Miller requests that the Court enter judgment in favor of plaintiff and the class and against defendant for:

a.      Appropriate statutory and punitive damages;

b.      Attorney's fees, litigation expenses and costs; and

c.      Such other or further relief as the Court deems appropriate.

### COUNT III - ILLINOIS CONSUMER FRAUD ACT

54.      Plaintiffs incorporate paragraphs 1-30.  This claim is against all

10

defendants.

55.     Defendants violated §2 of the Consumer Fraud Act, 815 ILCS 505/2, by unfairly and deceptively (1) misrepresenting to plaintiffs the market value of their residential property; and (2) concealing the fact that, based on the inflated appraisal, plaintiffs would receive a loan with an extremely high loan-to-value ratio.

56.     Defendants engaged in such conduct in the course of trade and commerce.

57.     Defendants intended that plaintiffs rely on their misrepresentations.

58.     Plaintiffs would not have taken out the loan if they had reason to know that the appraisal was inflated or that they were borrowing at an extremely high loan-to-value ratio.

59.     Defendants' deceptive and unfair conduct so infected the transaction that

60.     Plaintiffs were damaged as a result, in that (1) they were charged and paid excess points and fees and interest stemming from the inflated value and principal; and (2) they have attempted to but have been prevented from refinancing out of the high-loan-to-value loan, which was based on the inflated appraisal.

61.     Due to the inflated appraisal, plaintiffs have incurred special damages that require a special remedy.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a.     A judgment voiding plaintiffs' mortgage, capable of recordation in the public records, and binding on all defendants;

b.     Appropriate compensatory and punitive damages;

11

c.      Appropriate special damages; and

c.      Such other or further relief as the Court deems appropriate.

### COUNT IV - CIVIL CONSPIRACY

62.     Plaintiffs incorporate paragraphs 1-61 above.  This claim is against all defendants.

63.     Defendants intentionally inflated the appraised value or were aware that it was substantially inflated above the market value.

64.     Defendants misrepresented, concealed and suppressed the true market value of plaintiffs' property.  The value of the property and home was a material fact in the transaction.

65.     Defendants intended that plaintiffs rely on their misrepresentation, concealment and suppression of this fact.

66.     Plaintiffs took out the loan, the principal amount of which and other material terms were based on the inflated appraised value reported by Mr. Todd L. Lash.

67.     Defendants' conduct was willful.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a.      Actual damages;

b.      Incidental, consequential and special damages;

d.      Costs of litigation and expenses; and

e.      Such other or further relief as this Court deems appropriate.

12

_____
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)


## JURY DEMAND

    Plaintiffs demand trial by jury.

_____
Daniel A. Edelman


t:\17664\pleading\Complaint_pleading.wpd


13

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Benjamin Miller and Kathryn Miller | Ameriquest Mortgage Company, Ameriquest Mortgage Secur Inc., AMC Mortgage Services, Inc., Deutsche Bank National T |

| **(b)** County of Residence of First Listed Plaintiff    Sangamon | County of Residence of First Listed Defendant |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

| **(c)** Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| Edelman Combs Latturner & Goodwin, LLC <br> 120 S. LaSalle St., 18th Floor, Chicago, IL 60603. 312-739-4200 | |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ◻ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ◻ 2 U.S. Government Defendant
- ◻ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ◻ 1 | ◻ 1 | Incorporated or Principal Place of Business In This State | ◻ 4 | ◻ 4 |
| Citizen of Another State | ◻ 2 | ◻ 2 | Incorporated and Principal Place of Business In Another State | ◻ 5 | ◻ 5 |
| Citizen or Subject of a Foreign Country | ◻ 3 | ◻ 3 | Foreign Nation | ◻ 6 | ◻ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ◻ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ◻ 610 Agriculture | ◻ 422 Appeal 28 USC 158 | ◻ 400 State Reapportionment |
| ◻ 120 Marine | ◻ 310 Airplane | ◻ 362 Personal Injury - Med. Malpractice | ◻ 620 Other Food & Drug | ◻ 423 Withdrawal 28 USC 157 | ◻ 410 Antitrust |
| ◻ 130 Miller Act | ◻ 315 Airplane Product Liability | ◻ 365 Personal Injury - Product Liability | ◻ 625 Drug Related Seizure of Property 21 USC 881 | | ◻ 430 Banks and Banking |
| ◻ 140 Negotiable Instrument | ◻ 320 Assault, Libel & Slander | ◻ 368 Asbestos Personal Injury Product Liability | ◻ 630 Liquor Laws | **PROPERTY RIGHTS** | ◻ 450 Commerce |
| ◻ 150 Recovery of Overpayment & Enforcement of Judgment | ◻ 330 Federal Employers' Liability | | ◻ 640 R.R. & Truck | ◻ 820 Copyrights | ◻ 460 Deportation |
| ◻ 151 Medicare Act | ◻ 340 Marine | **PERSONAL PROPERTY** | ◻ 650 Airline Regs. | ◻ 830 Patent | ◻ 470 Racketeer Influenced and Corrupt Organizations |
| ◻ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ◻ 345 Marine Product Liability | ◻ 370 Other Fraud | ◻ 660 Occupational Safety/Health | ◻ 840 Trademark | ◻ 480 Consumer Credit |
| ◻ 153 Recovery of Overpayment of Veteran's Benefits | ◻ 350 Motor Vehicle | ☒ 371 Truth in Lending | ◻ 690 Other | **SOCIAL SECURITY** | ◻ 490 Cable/Sat T.V. |
| ◻ 160 Stockholders' Suits | ◻ 355 Motor Vehicle Product Liability | ◻ 380 Other Personal Property Damage | **LABOR** | ◻ 861 HIA (1395ff) | ◻ 810 Selective Service |
| ◻ 190 Other Contract | ◻ 360 Other Personal Injury | ◻ 385 Property Damage Product Liability | ◻ 710 Fair Labor Standards Act | ◻ 862 Black Lung (923) | ◻ 850 Securities/Commodities/ Exchange |
| ◻ 195 Contract Product Liability | | | ◻ 720 Labor/Mgmt. Relations | ◻ 863 DIWC/DIWW (405(g)) | ◻ 875 Customer Challenge 12 USC 3410 |
| ◻ 196 Franchise | | | ◻ 730 Labor/Mgmt. Reporting & Disclosure Act | ◻ 864 SSID Title XVI | ◻ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ◻ 740 Railway Labor Act | ◻ 865 RSI (405(g)) | ◻ 891 Agricultural Acts |
| ◻ 210 Land Condemnation | ◻ 441 Voting | ◻ 510 Motions to Vacate Sentence | ◻ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ◻ 892 Economic Stabilization Act |
| ◻ 220 Foreclosure | ◻ 442 Employment | **Habeas Corpus:** | ◻ 791 Empl. Ret. Inc. Security Act | ◻ 870 Taxes (U.S. Plaintiff or Defendant) | ◻ 893 Environmental Matters |
| ◻ 230 Rent Lease & Ejectment | ◻ 443 Housing/ Accommodations | ◻ 530 General | | ◻ 871 IRS—Third Party 26 USC 7609 | ◻ 894 Energy Allocation Act |
| ◻ 240 Torts to Land | ◻ 444 Welfare | ◻ 535 Death Penalty | | | ◻ 895 Freedom of Information Act |
| ◻ 245 Tort Product Liability | ◻ 445 Amer. w/Disabilities - Employment | ◻ 540 Mandamus & Other | | | ◻ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ◻ 290 All Other Real Property | ◻ 446 Amer. w/Disabilities - Other | ◻ 550 Civil Rights | | | ◻ 950 Constitutionality of State Statutes |
| | ◻ 440 Other Civil Rights | ◻ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ◻ 2 Removed from State Court
- ◻ 3 Remanded from Appellate Court
- ◻ 4 Reinstated or Reopened
- ◻ 5 Transferred from another district (specify)
- ◻ 6 Multidistrict Litigation
- ◻ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U. S. C. Sec 1601 et seq. and 12 C.F.R. part 226

Brief description of cause:
Violation of Truth in Lending Act and implementing Federal Reserve Board Regulation Z

## VII. REQUESTED IN COMPLAINT:
◻ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $    CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ◻ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE Marvin E. Aspen (NDIL)    DOCKET NUMBER MDL 1715/ NDIL 05-07097

DATE 01/31/2007    SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**E-FILED**
Monday, 05 February, 2007  02:58:45 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

Loan Number: 0081183584 - 7368

# ADJUSTABLE RATE NOTE
## (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

June 30, 2004
Date

Orange
City

CA
State

9 Hackney Ln, Springfield, IL  62702
Property Address

### 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 154,800.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is **Ameriquest Mortgage Company.**

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of **6.850 %**. This interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS
#### (A) Time and Place of Payments
I will pay principal and interest by making payments every month.
I will make my monthly payments on the first day of each month beginning on **September 1, 2004** .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on, **August 1, 2034** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my payments at:     **505 City Parkway West, Suite 100, Orange, CA 92868**

or at a different place if required by the Note Holder.
#### (B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 1,014.35. This amount may change.
#### (C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
#### (A) Change Dates
The interest rate I will pay may change on the first day of, **August, 2006** and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
#### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."
If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
#### (C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding **five and three-quarters** percentage point(s) (**5.750%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eight of one percent (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

Initials:


0000008118358400000590301

201-1UNIV (Rev. 07/03)

1 of 3

06/30/2004 3:00:07 PM

Loan Number:  0081183584 - 7368

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.850** % or less than **6.850**%.  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One** percentage point(s) **1.000**%) from the rate of interest I have been paying for the preceding  six  months. My interest rate will never be greater than **12.850** % or less than **6.850** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.  PREPAYMENT PRIVILEGE**

I may repay all or any part of the principal balance of this Note in accordance with the terms of this Section without incurring a prepayment charge.  A "prepayment" is any amount that I pay in excess of my regularly scheduled payments of principal and interest that the Lender will apply to reduce the outstanding principal balance  on this Note in accordance with this Section.

**(A) Application of Funds**

I agree that when I indicate in writing that I am making a prepayment, the Lender shall apply funds it receives in accordance with the order of application of payments set forth in Section 2 of the Security Instrument.

**(B) Monthly Payments**

If I make a prepayment of an amount less than the amount needed to completely repay all amounts due under this Note and Security Instrument, my regularly scheduled payments of principal and interest will not change as a result.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me.  If a refund reduces the principal, the reduction will be treated as a partial prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payment**

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be **5.000**% of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.  The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full  as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.



00000081183584030059030 2

201-2UNIV (Rev. 07/03)

2 of 3

Initials:

06/30/2004 3:00:07 PM

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonable determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition of Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**Oral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written agreement contains all the terms the Borrower(s) and the Lender have agreed to. Any subsequent agreement between us regarding this Note or the instrument which secures this Note, must be in a signed writing to be legally enforceable.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)        _____(Seal)
Borrower   Benjamin R Miller                                  Borrower

_____(Seal)        _____(Seal)
Borrower                                                      Borrower



0000008118358403000590303

# EXHIBIT B

Return To:

**Ameriquest Mortgage Company**
**P.O. Box 11507,**
**Santa Ana, CA 92711**

        **Ameriquest Mortgage Company**
Prepared By:

**Tanya Mitchell-Smith**
**1551 Wall Street, Suite**
**#120,St. Charles, MO 63303**

———————————————— [Space Above This Line For Recording Data] ————————————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **June 30, 2004**                          ,
together with all Riders to this document.
**(B) "Borrower"** is **Benjamin R Miller and KATHERINE A MILLER, Husband and Wife,**
**Not As Joint Tenants Or Tenants In**
**Common But As Tenants By The Entirety**

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is **Ameriquest Mortgage Company**

Lender is a **Corporation**
organized and existing under the laws of **Delaware**

**ILLINOIS** - Single Family - **Fannie Mae/Freddie Mac** UNIFORM INSTRUMENT                    **Form 3014 1/01**
  **06/30/2004 3:00:07**                                        **0081183584 - 7368**

**AM6IL** (0311)
Page 1 of 15                          Initials: _____
          VMP Mortgage Solutions (800)521-7291                          0000008118358401301261601

Lender's address is **1100 Town and Country Road, Suite 200  Orange, CA 92868**

Lender is the mortgagee under this Security Instrument.

**(D) "Note"** means the promissory note signed by Borrower and dated **June 30, 2004**
The Note states that Borrower owes Lender **one hundred fifty-four thousand eight
hundred and 00/100**                                                    Dollars
(U.S. $ **154,800.00**        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **August 1, 2034**

**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used in this
Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a
"federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan"
under RESPA.

Initials: _____

**AM6IL** (0311)                    Page 2 of 15                    **Form 3014  1/01**

0081183584 - 7368

06/30/2004 3:00:07



0000008118358430301261602

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, the following described property located in the
**County**                                                                                       [Type of Recording Jurisdiction]
of **SANGAMON**                                        [Name of Recording Jurisdiction]:

**Legal Description Attached Hereto and Made a Part Hereof.**

Parcel ID Number: **14190253006**                          which currently has the address of
**9 Hackney Ln**                                                                              [Street]
**Springfield**                                          [City], Illinois **62702**          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

Initials: _____

**AM6IL** (0311)                              Page 3 of 15                          **Form 3014  1/01**
06/30/2004 3:00:07 PM                                    0081183584 - 7368



000000811835840301261603

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any
prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items
pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.
currency. However, if any check or other instrument received by Lender as payment under the Note or this
Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments
due under the Note and this Security Instrument be made in one or more of the following forms, as selected
by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check,
provided any such check is drawn upon an institution whose deposits are insured by a federal agency,
instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at
such other location as may be designated by Lender in accordance with the notice provisions in Section 15.
Lender may return any payment or partial payment if the payment or partial payments are insufficient to
bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan
current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial
payments in the future, but Lender is not obligated to apply such payments at the time such payments are
accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest
on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan
current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds
or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal
balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have
now or in the future against Lender shall relieve Borrower from making payments due under the Note and
this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all
payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due
under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be
applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be
applied first to late charges, second to any other amounts due under this Security Instrument, and then to
reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a
sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the
late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from
Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in
full. To the extent that any excess exists after the payment is applied to the full payment of one or more
Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be
applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the
Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under
the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a)
taxes and assessments and other items which can attain priority over this Security Instrument as a lien or
encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums
for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any,
or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in
accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at
any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and
Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow
Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.
Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay
the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for
any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver,

Initials: _____

AM6IL (0311)                    Page 4 of 15                    **Form 3014  1/01**

0081183584 - 7368

06/30/2004  3:00:07


0000008118358403012616O4

Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Initials: _____

**AM6IL** (0311)                              Page 5 of 15                              **Form 3014   1/01**

0081183584 - 7368

06/30/2004  3:00:07



0000008118358403012616 05

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

Initials: _____

**AM6IL** (0311)                                    Page 6 of 15                                    **Form 3014  1/01**

0081183584 - 7368

06/30/2004  3:00:07



0000008118358430301261606

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Initials: _____

**AM6IL** (0311)                    Page 7 of 15                    **Form 3014   1/01**

0081183584 - 7368

06/30/2004 3:00:07



0000008118358403012261607

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

---

0081183584 - 7368

06/30/2004 3:00:07



0000008118358403012616608

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any

Initials: _____

**AM6IL** (0311)                    Page 9 of 15                    **Form 3014  1/01**

0081183584 - 7368

06/30/2004  3:00:07


0000008118358403012 61609

Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: _____

AM6IL (0311)                         Page 10 of 15                         Form 3014  1/01

0081183584 - 7368

06/30/2004  3:00:07


0000008118358400301261610

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

Initials: _____

AM6IL (0311)                    Page 11 of 15                    Form 3014  1/01

0081183584 - 7368

06/30/2004 3:00:07


0000008118358403012616611

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: _____

AM6IL (0311)                          Page 12 of 15                          **Form 3014  1/01**

0081183584 - 7368

06/30/2004  3:00:07



0000008118358403012616 12

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

**25. Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

Initials: _____

AM6IL (0311)                        Page 13 of 15                        Form 3014  1/01

0081183584 - 7368

06/30/2004 3:00:07



0000008118358403012616l3

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
**Benjamin R Miller**                    -Borrower

_____

_____ (Seal)
KATHERINE A MILLER                       -Borrower

_____ (Seal)          _____ (Seal)
                -Borrower                                 -Borrower

_____ (Seal)          _____ (Seal)
                -Borrower                                 -Borrower

_____ (Seal)          _____ (Seal)
                -Borrower                                 -Borrower

06/30/2004 3:00:07 PM                            0081183584 - 7368


0000008118358403012616614

**STATE OF ILLINOIS,**                    **County ss:**

I, _____ a Notary
Public in and for said county and in said state, hereby certify that

_____

_____

_____

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing
instrument, appeared before me this day in person, and acknowledged that he/she/they signed
and delivered the said instrument as his/her/their free and voluntary act, for the uses and
purposes therein set forth.

   Given under my hand and official seal of this                                    .

My Commission Expires:

_____
Notary Public


0000000811835840301261615

400-15IL (4/02)            Page 15 of 15            0081183584 - 7368

06/30/2004 3:00:07 PM

BORROWER NAME:

LOAN NUMBER:   0081183584 - 7368

---

## LEGAL DESCRIPTION

0000008118835840301261616

LGL3LTR (09/03)

## ADJUSTABLE RATE RIDER

### (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 30th day of June , 2004   and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Ameriquest Mortgage Company (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

9 Hackney Ln, Springfield, IL  62702

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS**. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of   **6.850** %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
The interest rate I will pay may change on the first day of August, 2006 , and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

   **(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index.   The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the Wall Street Journal.  The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

Initials_____

Loan Number:  0081183584 - 7368


0000008118358440302150301

610-1 (Rev 1/01)                                   Page 1 of 3                          06/30/2004 3:00:07 PM

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **five and three-quarters** percentage points ( **5.750** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.850% or less than 6.850%.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One( **1.000 %)** from the rate of interest I have been paying for the preceding   six months. My interest rate will never be greater than 12.850)% or less than 6.850)%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials_____

Loan Number:  0081183584 - 7368



000000811835840302150302

610-2 (Rev 1/01)                           Page 2 of 3

06/30/2004 3:00:07 PM

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)    _____ (Seal)
Borrower Benjamin R Miller                   Borrower KATHERINE A MILLER

_____ (Seal)    _____ (Seal)
Borrower                                     Borrower

Loan Number:  0081183584 - 7368


0000008118358403021503303

# EXHIBIT C

(Printed on Jun 30, 2004 @ 17.51)   US Department of Housing and Urban Development   OMB No. 2502-0491

## SETTLEMENT STATEMENT (Transactions Without Sellers)

| File Number: 10-00538428 | Loan Number: 0081183584 | Mortgage Ins. Case #: |
|---|---|---|

NAME AND ADDRESS OF BORROWER: BENJAMIN MILLER, 9 HACKNEY LN SPRINGFIELD IL, 62702

NAME AND ADDRESS OF LENDER: AMERIQUEST MORTGAGE COMPANY 1551 WALL STREET SUITE 120 ST. CHARLES, MO, 63303

PROPERTY LOCATION: 9 HACKNEY LN SPRINGFIELD IL, 62702

SETTLEMENT AGENT: NORTHWEST TITLE & ESCROW CORP. HMILLERY
PLACE OF SETTLEMENT:

| SETTLEMENT DATE: 06/30/2004 | DISBURSEMENT DATE: 07/05/2004 |
|---|---|

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable In Connection With Loan | | 1501. PAYOFF | |
| 801. Loan Origination Fee | | PERSONAL FINANCE | $4,237.00 |
| 802. Loan Discount 1.250% to AMERIQUEST MORTGAGE COMI | $1,935.00 | 1502. PAYOFF | |
| 803. Appraisal Fee REIMBURSED TO LENDER | $999.00 | PROVIDIAN FINANCIAL | $1,078.00 |
| 804. Credit Report | | 1503. PAYOFF | |
| 805. Lender's Inspection Fee | | NATIONAL CITY MORTGAGE | $135,813.00 |
| 806. Mortgage Insurance Application Fee to AMERIQUEST MORT | $360.00 | 1504. PAYOFF | |
| 807. Assumption Fee | | LOWES/MBGA | $1,695.00 |
| 808. Lender's Processing Fee to AMERIQUEST MORTGAGE CO | $626.00 | 1505. | |
| 809. Admin fee to AMERIQUEST MORTGAGE COMPANY | $239.00 | | |
| 810. Tax Related Service Fee to AMERIQUEST MORTGAGE COI | $70.00 | 1506. | |
| 811. Flood Search Fee to AMERIQUEST MORTGAGE COMPANY | $16.00 | | |
| 900. Items Required By Lender To Be Paid In Advance | | 1507. | |
| 901. Interest from 07/07/2004 TO 08/01/2004 @$29.05/DAY | $726.25 | | |
| 902. Mortgage Insurance Premium for | | 1508. | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard Insurance | | | |
| 1002. Mortgage Insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. | | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee REJ SERVICES LLC | $200.00 | 1515. | |
| 1102. Abstract or title search to NORTHWEST TITLE & ESCROW | $150.00 | | |
| 1103. Title examination | | 1516. | |
| 1104. Title Insurance binder | | | |
| 1105. Document preparation | | 1517. | |
| 1106. Notary Fees | | | |
| 1107. Attorney's Fees | | 1518. | |
| (Includes above item numbers:   ) | | | |
| 1108. Title Insurance to NORTHWEST TITLE & ESCROW CORP | $300.00 | 1519. | |
| (Includes above item numbers:   ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1003) | |
| 1110. Owner's coverage | | | $142,823.00 |
| 1111. Settlement disbursement fee to NORTHWEST TITLE & ES | $175.00 | | |
| 1112. | | | |
| 1113. | | N. Net Settlement | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees: Mort $   Sat $ | $130.00 | 1600. Loan Amount | $154,800.00 |
| 1202. City/county tax/stamps: | | | |
| 1203. State tax/stamps: | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. | | | |
| 1205. | | 1602. Minus total settlement charges | $5,966.25 |
| 1300. Additional Settlement Charges | | (Line 1400) | |
| 1301. Survey | | 1603. Minus total Disbursements to | $142,823.00 |
| 1302. Pest Inspection | | Others (line 1520) | |
| 1303. Courier fee to NORTHWEST TITLE & ESCROW CORP. | $40.00 | 1604. Equals disbursements to borrower | $6,010.75 |
| 1304. | | | |
| 1305. ARM endorsement | | | |
| 1400. Total settlement charges (enter on line 1602) | $5,966.25 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge this HUD-1A ref. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.
The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause funds to be disbursed in accordance with this statement.

_____   X _____
Northwest Title & Escrow Corp.   BENJAMIN MILLER

# EXHIBIT D

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

[ ] Preliminary        [X] Final

LENDER: Ameriquest Mortgage Company
1551 Wall Street, Suite #120
St. Charles, MO 63303
(636)255-9001

Broker License:

Borrowers: Benjamin R Miller

Type of Loan:  ADJUSTABLE RATE
Date:  June 30, 2004

Address:       9 Hackney Ln
City/State/Zip:  Springfield, IL 62702

Loan Number:  0081183584 - 7368

Property:     9 Hackney Ln, Springfield, IL  62702

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.716  % | $ 240,935.49 | $ 150,437.75 | $ 391,373.24 |

**YOUR PAYMENT SCHEDULE WILL BE:**

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $1,014.35 | 09/01/2004 | | | |
| 335 | $1,092.38 | 09/01/2006 | | | |
| 1 | $1,081.54 | 08/01/2034 | | | |

**VARIABLE RATE FEATURE:**
[X] Your loan has a variable rate feature . Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:**    You are giving a security interest in the property located at:  9 Hackney Ln, Springfield, IL  62702

**ASSUMPTION:**  Someone buying this property  [X] cannot assume the remaining balance due under original terms.
[ ] may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:**    You may obtain property insurance from anyone you want that is acceptable to
Ameriquest Mortgage Company

**LATE CHARGES:**  If a payment is late, you will be charged  5.000%  of the overdue payment .

**PREPAYMENT:**  If you pay off your loan early, you
[ ] may  [X] will not  have to pay a penalty.
**See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

Borrower Benjamin R Miller _____  Date _____

Borrower  KATHERINE A MILLER _____  Date _____

Borrower _____  Date _____

Borrower _____  Date _____



TIL1 (Rev. 7/01)

0000008118358403057501O1

**ORIGINAL COPY**

06/30/2004 3:00:07 PM

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

| | Preliminary | X | Final |
|---|---|---|---|

LENDER: Ameriquest Mortgage Company
1551 Wall Street, Suite #120
St. Charles, MO 63303
(636)255-9001

Broker License:

Borrowers: Benjamin R Miller

Type of Loan: ADJUSTABLE RATE
Date: June 30, 2004

Address:      9 Hackney Ln
City/State/Zip: Springfield, IL 62702

Loan Number: 0081183584 - 7368

Property:      9 Hackney Ln, Springfield, IL 62702

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.716          % | $  240,935.49 | $  150,437.75 | $  391,373.24 |

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 24 | $1,014.35 | 09/01/2004 | | | |
| 335 | $1,092.38 | 09/01/2006 | | | |
| 1 | $1,081.54 | 08/01/2034 | | | |

**VARIABLE RATE FEATURE:**
X   Your loan has a variable rate feature . Disclosures about the variable rate feature have been provided to you earlier.

**SECURITY:**   You are giving a security interest in the property located at: 9 Hackney Ln, Springfield, IL 62702

**ASSUMPTION:**   Someone buying this property
X   cannot assume the remaining balance due under original terms.
    may assume, subject to lender's conditions, the remaining balance due under original terms.

**PROPERTY INSURANCE:**   You may obtain property insurance from anyone you want that is acceptable to
Ameriquest Mortgage Company

**LATE CHARGES:**   If a payment is late, you will be charged  5.000%  of the overdue payment .

**PREPAYMENT:**   If you pay off your loan early, you
    may    X   will not   have to pay a penalty.
**See your contract documents for any additional information regarding non-payment, default, required repayment in full before the scheduled date, and prepayment refunds and penalties.**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____
Borrower Benjamin R Miller                     Date

_____
Borrower KATHERINE A MILLER                 Date

_____
Borrower                                          Date

_____
Borrower                                          Date


TIL1 (Rev. 7/01)     0000008118358403005750101

**BORROWER COPY**

06/30/2004 3:00:07 PM

# EXHIBIT E

# NOTICE OF RIGHT TO CANCEL

LENDER:   Ameriquest Mortgage Company

DATE:  June 30, 2004
LOAN NO.:   0081183584 - 7368
TYPE:   ADJUSTABLE RATE

BORROWER(S): Benjamin R Miller

ADDRESS:       9 Hackney Ln
CITY/STATE/ZIP:   Springfield,IL 62702

PROPERTY:   9 Hackney Ln
                Springfield,  IL  62702

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1.  The date of the transaction, which is

| ENTER DOCUMENT SIGNING DATE |
| _____ |

;

or

2.  The date you received your Truth in Lending disclosures;

or

3.  The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company
1600 S Douglass Rd
Anaheim, CA 92806**

ATTN:  **FUNDING**
PHONE: **(714)634-3494**
FAX:     **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

| ENTER FINAL DATE TO CANCEL |
| _____ |

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
**I WISH TO CANCEL**

_____                    _____
SIGNATURE                                            DATE

---

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

| BORROWER/OWNER Benjamin R Miller | Date | BORROWER/OWNER KATHERINE A MILLER | Date |
| --- | --- | --- | --- |
| BORROWER/OWNER | Date | BORROWER/OWNER | Date |

I064-NRC (Rev 01/04)

0000008118358404000501 01

**LENDER COPY**

06/30/2004 3:00:07 PM

## NOTICE OF RIGHT TO CANCEL

LENDER:   Ameriquest Mortgage Company

DATE:  June 30, 2004
LOAN NO.:   0081183584 - 7368
TYPE:   ADJUSTABLE RATE

BORROWER(S): Benjamin R Miller

ADDRESS:        9 Hackney Ln
CITY/STATE/ZIP:   Springfield,IL 62702

PROPERTY:   9 Hackney Ln
            Springfield,  IL  62702

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1.  The date of the transaction, which is

| ENTER DOCUMENT SIGNING DATE |
| --- |
|  |
|  |

;

or
2.  The date you received your Truth in Lending disclosures;
    or
3.  The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**          ATTN:  **FUNDING**
**1600 S Douglass Rd**                   PHONE: **(714)634-3494**
**Anaheim, CA 92806**                    FAX:    **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

| ENTER FINAL DATE TO CANCEL |
| --- |
|  |
|  |

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
**I WISH TO CANCEL**

_____                    _____
SIGNATURE                                       DATE

---

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_____  Date    _____  Date
BORROWER/OWNER Benjamin R Miller      BORROWER/OWNER KATHERINE A MILLER

_____  Date    _____  Date
BORROWER/OWNER                        BORROWER/OWNER

1064-NRC (Rev 01/04)

0000008118358404000050101

**BORROWER COPY**

06/30/2004 3:00:07 PM

# NOTICE OF RIGHT TO CANCEL

LENDER:   Ameriquest Mortgage Company

DATE:   June 30, 2004
LOAN NO.:   0081183584 - 7368
TYPE:   ADJUSTABLE RATE

BORROWER(S): Benjamin R Miller

ADDRESS:        9 Hackney Ln
CITY/STATE/ZIP:   Springfield, IL 62702

PROPERTY:   9 Hackney Ln
                    Springfield, IL  62702

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

1. The date of the transaction, which is

   | ENTER DOCUMENT SIGNING DATE |
   | --- |
   |   |

   ;

   or
2. The date you received your Truth in Lending disclosures;
   or
3. The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**Ameriquest Mortgage Company**
**1600 S Douglass Rd**
**Anaheim, CA 92806**

ATTN:  **FUNDING**
PHONE: **(714)634-3494**
FAX:      **(800)664-2256**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of

| ENTER FINAL DATE TO CANCEL |
| --- |
|   |

(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
**I WISH TO CANCEL**

_____        _____
SIGNATURE                                              DATE

---

The undersigned each acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

_____        _____        _____        _____
BORROWER/OWNER Benjamin R Miller        Date        BORROWER/OWNER KATHERINE A MILLER        Date

_____        _____        _____        _____
BORROWER/OWNER                                  Date        BORROWER/OWNER                                  Date

1064-NRC (Rev 01/04)   
0000008118356404000050101

**BORROWER COPY**

06/30/2004 3:00:07 PM

# EXHIBIT F

# ONE WEEK CANCELLATION PERIOD

Loan Number: 0081183584 - 7368                  Borrower(s): Benjamin R Miller

Date:  June 30, 2004

**You have the right under Federal or state law to three (3) business days during which you can cancel your loan for any reason.**  This right is described in the Notice of Right to Cancel you have received today.

Ameriquest Mortgage Company believes that a loan secured by your home is one of the most important financial decisions you can make.  To give you more time to study your loan documents, obtain independent advice and/or shop for a loan that you believe suits you better, **we provide you with one-week (which includes the day you sign the loan documents) to cancel the loan with no cost to you.**  No money will be disbursed before 10:00 a.m. on the first business day after this period expires. Business days are Monday through Friday, excluding federal legal holidays.

For example, if your loan closes on a Tuesday, you could cancel from that Tuesday through midnight of the following Monday.

If you want to cancel, you must do so in writing and we must receive your request before midnight on the day the cancellation period ends.  You may cancel by signing and dating in the request to cancel box below or by using any other written statement that provides your loan number and states your desire to cancel your loan.  The written statement must be signed and dated by any one borrower.  Your request must be delivered to:

> Ameriquest Mortgage Company
> 1600 S Douglass Rd Anaheim, CA 92806
> ATTN: Funding Department
> Phone: (714)541-9960
> Fax: (800)664-2256

When you sign below, it means that you have received and read a copy of this notice and you understand what is printed above.

I/We hereby acknowledge receiving a copy of this notice on the date signed below.

_____         _____
Borrower/Owner  Benjamin R Miller            Date

_____         _____
Borrower/Owner  KATHERINE A MILLER           Date

_____         _____
Borrower/Owner                               Date

_____         _____
Borrower/Owner                               Date

---

## REQUEST TO CANCEL

I/We want to cancel loan #_____.

_____         _____
Borrower/Owner Signature                     Date



0000008118358404042201101

850 (10/00)

06/30/2004 3:00:07 PM

**BORROWER COPY**

**E-FILED**
Monday, 05 February, 2007  02:59:01 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT G

## CLOSING INSTRUCTIONS
## ITEMIZATION OF SETTLEMENT CHARGES

| Title Company/Attorney NORTHWEST TITLE & ESCROW CORP. | Title Officer/Attorney FRANK T. GRIBBENOW | Phone Number (651)489-2656 | Order Number 538373 |
|---|---|---|---|
| Borrower(s) Benjamin R Miller | / | Property Address 9 Hackney Ln Springfield          IL          62702 Loan Number: 0091188584 | |

FROM: **Ameriquest Mortgage Company • St. Charles, MO**   Phone No. **(636)235-0001**   Fax **(636)235-0002**
Branch Name                                Branch Phone No.                        Branch Fax Number

BELOW IS A LIST OF ALL SETTLEMENT CHARGES AND DISBURSEMENTS APPLICABLE TO THIS LOAN. YOU MUST USE
THESE FIGURES TO PREPARE YOUR SETTLEMENT STATEMENT. YOU CANNOT DEVIATE FROM THESE FIGURES WITHOUT
PRIOR WRITTEN AUTHORIZATION FROM  VICE PRESIDENT OF LOAN OPERATIONS AND/OR ITS DIRECTORS .

| LINE NO. ON SETTLEMENT STATEMENT                    PAYEE | AMOUNT |
|---|---|
| 801. Loan origination fee       % to | |
| 802. Loan discount  1.290 % to Ameriquest Mortgage Company | $1,936.00 |
| 803. Apprsl/Prop Val to Reimbursed to Lender | $899.00 |
| 808. Yield Spread Premium to | |
| 809. | |
| 810. Tax Related Service Fee to Ameriquest Mortgage | $70.00 |
| 811. Flood Search Fee to Ameriquest Mortgage Company | $16.00 |
| 812. Lenders Processing Fee to Ameriquest Mortgage | $826.00 |
| 813.Admin to Ameriquest Mortgage Company | $239.00 |
| 814. Doc. Prep. Fee to | |
| 815. Credit Report Fee to | |
| 816. Origination Fee    % to | |
| 817. Application Fee to Ameriquest Mortgage Company | $360.00 |
| 818. Underwriting Fee to | |
| 819. Service Provider Fee to | |
| 820. Processing Fee  to | |
| 821. Underwriting Fee to | |
| 822. Appraisal Fee to | |
| 901. Interest from 07/07/2004  to 08/01/2004  @  $29.05 per day | $725.25 |
| 902. Mortgage Insurance premium for          months to | |
| 903. Hazard Ins prem  to | $0.00 |
| 904. Flood Ins prem  to | |
| 1001. Hazard Insurance     months @ $   per month | |
| 1002. Mortgage Insurance     months @ $   per month | |
| 1003. Earthquake ins   months @ $   per month | |
| 1004. County prop. taxes   months @ $   per month | |
| 1005. Annual assess.   months @ $   per month | |
| 1006. Flood   months @ $   per month | |
| 1007. Windstorm Ins   months @ $   per month | |
| 1008. | |
| 1101. Settlement or closing fee to REJ SERVICES LLC | $200.00 |
| 1102. Abstract or title search to NORTHWEST TITLE & | $175.00 |
| 1103. Title examination to | |
| 1105. Document preparation to | |
| 1106. Notary fees to | |
| 1107. Attorney's fees to | |
| 1108. Title insurance to NORTHWEST TITLE & ESCROW   "L $210.00 *  $0.00 | $300.00 |
| 1109. Lender's coverage | |
| 1110. Owner's coverage         $          $300.00 | |
| 1111. Settlement/Disbursement fee to NORTHWEST TITLE | $150.00 |
| 1112. Escrow Fee to | |
| 1201. Recording fees | $130.00 |
| 1202. City/county tax/stamps | |
| 1203. State tax/ stamps | |
| 1204. State specific fee | |
| 1301. Demand to | |
| 1302. Pest Inspection to | |
| 1303. Survey Fee | |
| 1304. Staff Appraiser Fee | |
| 1305. Reconveyance Fee to | |
| 1306. | |
| 1307. Property Val Fee to | |
| 1308. Courier Fee | $40.00 |

*Any amounts appearing on these lines are prepaid finance charges and cannot be increased or added once loan documents
have been prepared unless new loan documents are generated.

| Borrower  Benjamin R Miller | Date | Borrower | Date |
|---|---|---|---|
| Borrower | Date | Borrower | Date |
| Title Company Representative Signature | 6/30/04 Date | | |

[barcode]

# EXHIBIT H

## ITEMS TO BE PAID OFF FROM LOAN PROCEEDS

Borrower : Benjamin R Miller

Loan Number : 0081183584 - 7368

| Payee | | Amount |
|-------|---|--------|
| PERSONAL FINANCE CO | (W) | $4,237.00 |
| PROVIDIAN FINANCIAL | (W) | $1,078.00 |
| NATIONAL CITY MORTGA | (W) | $135,813.00 |
| LOWES/MBGA | (W) | $1,695.00 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Total Wire:    $160,036.75

Loan Amount:        154,800.00

L = Lender Paid

Cash/Check from
Borrower:

Borrower Proceeds:        $8,010.75

Borrower  Benjamin R Miller                    Date        Borrower                    Date

Borrower                                        Date        Borrower                    Date

Title Company Representative Signature          6/30/04
                                                Date

834-FUNV (8/2004)

# EXHIBIT I



# ..AMC
## MORTGAGE SERVICES℠

P.O. Box 11000, Santa Ana, CA 92711-1000
Toll Free (800) 430-5262
www.myamcloan.com

August 18, 2006

Benjamin R Miller
9 Hackney Ln
Springfield, IL 62702-


Re:   Loan No: 0081183584
      Property: 9 Hackney Ln
                Springfield IL 62702


Dear Homeowner(s):

As requested, enclosed is a copy of the Appraisal Report on the above
referenced property. The Appraisal Report is being sent to you with the
following terms and conditions. If you are unable or unwilling to comply
with all of the conditions set forth below, please return the Appraisal
Report to:

                    AMC Mortgage Services, Inc.
                        P.O. Box 11000
                     Santa Ana, CA 92711-1100
               Attention:   Customer Care Department

1.  The Appraisal Report is to be used solely for the purpose of
    evaluating your property in connection with your loan.

2.  You understand, acknowledge, and agree that the Appraisal Report is
    being provided by AMC Mortgage Services (AMC) without any
    representations or warranties as to its contents.

3.  You understand, acknowledge, and agree that intervening circum-
    stances may have rendered the information and assumptions contained
    in the Appraisal Report obsolete, incomplete, or even misleading.

4.  You understand, acknowledge, and agree that the Appraisal Report was
    prepared for the exclusive use of AMC, and that subsequent
    distribution was not contemplated when the Appraisal Report was
    commissioned, prepared, or delivered.

5.  You covenant and agree not to seek any damages or redress or to make
    any claims for damages, costs, expenses, or liabilities of any kind
    against the appraiser or arising out of your use of the Appraisal
    Report.

RA002/007/X1R

Federal Law requires us to notify you that we are acting as a debt collector. If you are currently in a bankruptcy or have
received a discharge in bankruptcy as to this obligation, this communication is intended for informational purposes
only and is not an attempt to collect a debt in violation of the automatic stay or the discharge injunction.

Also doing business as Delaware AMC Mortgage Services, Inc., in the states of Texas, Rhode Island, and New Hampshire.





P.O. Box 11000, Santa Ana, CA 92711-1000
Toll Free (800) 430-5262
www.myamcloan.com

Appraisal Report Request Letter
Page 2

6.  You covenant and agree to indemnify, defend, and hold AMC, its
    shareholders, officers, directors, employees, affiliates, and agents
    harmless from and against any claims, costs, expenses, damages, or
    liabilities of any kind including reasonable attorney's fees incurred
    AMC resulting from or arising out of your use of the Appraisal
    Report.

7.  You covenant and agree to keep the Appraisal Report confidential and
    not disclose, distribute, disseminate, copy, or otherwise reproduce
    or release the Appraisal Report or its contents to any person except
    as is strictly necessary for the evaluation or understanding of the
    Appraisal Report, in any manner to any person without first obtaining
    a written agreement of confidentiality similar in scope to this
    letter.

Please keep this letter with your other loan records.

For information on your home loan, visit www.myamcloan.com.  If you have
any additional questions or concerns, please contact Customer Care at
(800) 430-5262, Monday through Friday, 5:00 a.m. to 6:00 p.m., Pacific
Time.

Sincerely,

Customer Care

RA002/007/X1R

Federal Law requires us to notify you that we are acting as a debt collector. If you are currently in a bankruptcy or have
received a discharge in bankruptcy as to this obligation, this communication is intended for informational purposes
only and is not an attempt to collect a debt in violation of the automatic stay or the discharge injunction.
Also doing business as Delaware AMC Mortgage Services, Inc., in the states of Texas, Rhode Island, and New Hampshire.





| Borrower/Client | Benjamin Miller | | | | File No. | 04062260 |
| Property Address | 9 Hackney Ln | | | | | |
| City | Springfield | County | Sangamon | State | IL | Zip Code | 62702-1508 |
| Lender | Ameriquest | | | | | |

## TABLE OF CONTENTS

Letter of Transmittal ............................................................................................................................................... 1
Summary of Salient Features ................................................................................................................................... 2
URAR ......................................................................................................................................................................... 3
Supplemental Addendum .......................................................................................................................................... 5
Subject Photos .......................................................................................................................................................... 8
Subject Photograph Addendum ................................................................................................................................ 8
Comparable Photos 1-3 ........................................................................................................................................... 10
Statement of Limiting Conditions ............................................................................................................................ 11
Location Map ............................................................................................................................................................ 13
Building Sketch (Page - 1) ........................................................................................................................................ 14
Flood Map ................................................................................................................................................................ 15
USPAP Identification ............................................................................................................................................... 16
Multipurpose Supplemental Addendum .................................................................................................................. 17

Amariquest
1551 Wall St
StCharles, Mo 63303

Re: Property:    9 Hackney La
                 Springfield, IL 62702-1508
    Borrower:    Benjamin Miller
    File No.:

In accordance with your request, we have appraised the above referenced property. The report of that appraisal is
attached.

The purpose of this appraisal is to estimate the market value of the property described in this appraisal report, as
improved, in unencumbered fee simple title of ownership.

This report is based on a physical analysis of the site and improvements, a locational analysis of the neighborhood and
city, and an economic analysis of the market for properties such as the subject. The appraisal was developed and the
report was prepared in accordance with the Uniform Standards of Professional Appraisal Practice.

The value conclusions reported are as of the effective date stated in the body of the report and contingent upon the
certification and limiting conditions attached.

It has been a pleasure to assist you. Please do not hesitate to contact me or any of my staff if we can be of additional
service to you.

Kind regards,

Todd L. Kaar
EPIC Appraisal Service

## SUMMARY OF SALIENT FEATURES

| | | |
|---|---|---|
| **SUBJECT INFORMATION** | Subject Address | 9 Hackney Ln |
| | Legal Description | See Title |
| | City | Springfield |
| | County | Sangamon |
| | State | IL |
| | Zip Code | 62702-1508 |
| | Census Tract | 0002.01 |
| | Map Reference | 14190253006 |
| **SALES PRICE** | Sale Price | $ Refinance |
| | Date of Sale | N/A |
| **CLIENT** | Borrower / Client | Benjamin Miller |
| | Lender | Ameriquest |
| **DESCRIPTION OF IMPROVEMENTS** | Size (Square Feet) | 2,264 |
| | Price per Square Foot | $ |
| | Location | Suburban / Ave |
| | Age | 25+/- |
| | Condition | Average |
| | Total Rooms | 9 |
| | Bedrooms | 4 |
| | Baths | 2.5 |
| **APPRAISER** | Appraiser | Todd L. Lash |
| | Date of Appraised Value | 06/03/2004 |
| **VALUE** | Final Estimate of Value | $ 172,000 |



www.splcappraiserservices.com    [Fax No. 04062260] Page #3

0081183584

# UNIFORM RESIDENTIAL APPRAISAL REPORT
File No. 04062260

| Property Description | | |
|---|---|---|
| Property Address: 9 Hackney Ln | City Springfield | State IL Zip Code 62702-1508 |

Legal Description   See Title     County Sangamon

Assessor's Parcel No. 1419253006    Tax Year 2002   R.E. Taxes $ 2,467.68   Special Assessments $ 0.00

Borrower Benjamin Miller    Current Owner Benjamin Miller    Occupant: ☑ Owner ☐ Tenant ☐ Vacant

Property rights appraised ☑ Fee Simple ☐ Leasehold   Project Type ☐ PUD ☐ Condominium (HUD/VA only)   HOA $ N/A   /Mo.

Neighborhood or Project Name   See Title     Map Reference 1419253006    Census Tract 0002.01

Sale Price $   Refinance    Date of Sale N/A    Description and $ amount of loan charges/concessions to be paid by seller N/A

Lender/Client   Ameriquest     Address 1551 Wall St 120, StCharles, Mo 63303

Appraiser   Todd L. Lash     Address 2325 Fourth St Suite B, Peru, IL 61362

| | | | | |
|---|---|---|---|---|
| Location | ☐ Urban ☑ Suburban ☐ Rural | Predominant occupancy | Single family housing | Present land use % | Land use change |
| Built up | ☑ Over 75% ☐ 25-75% ☐ Under 25% | | PRICE $(000) / AGE | One family 100 | ☑ Not likely ☐ Likely |
| Growth rate | ☐ Rapid ☑ Stable ☐ Slow | ☑ Owner | 100 Low 5 | 2-4 family | ☐ In process |
| Property values | ☐ Increasing ☑ Stable ☐ Declining | ☐ Tenant | 200 High 45 | Multi-family | To: |
| Demand/supply | ☐ Shortage ☑ In balance ☐ Over supply | ☑ Vacant (0-5%) | Predominant | Commercial | |
| Marketing time | ☐ Under 3 mos. ☑ 3-6 mos. ☐ Over 6 mos. | ☐ Vac/over 5% | 145 20 | | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics:   The subject's neighborhood may be defined as the community of Springfield.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): The employment stability and general economy of the Springfield area, in which the subject is located, is considered to be stable to moderately increasing. Schools, places of worship, recreational areas, downtown business district and other amenities are all within one mile of the subject property. Access to employment centers, a shopping mall, community college, regional airport, hospitals, state parks, and interstate highway systems gives the area good appeal.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time — such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): Marketing time is considered to be 90 - 120 days in most sub markets, based on information obtained from the Multiple Listing Service, which is assumed to be correct. The market appears to be stable and reasonably active. Supply and demand appear to be in balance. Mortgage money is available at competitive interest rates to qualified buyers. The financing for the subject property is consistent with financing in the local market area. Loan discounts, interest buy downs and concessions are not prevalent in the subject's sub market.

Project Information for PUDs (if applicable) — is the developer/builder in control of the Home Owners' Association (HOA)?   ☐ Yes ☐ No

Approximate total number of units in the subject project     Approximate total number of units for sale in the subject project

Describe common elements and recreational facilities:

| | | | |
|---|---|---|---|
| Dimensions   1 Acre+/- | | | Topography   Level At Grade |
| Site area   1 Acre +/- | | Corner Lot ☐ Yes ☑ No | Size   Typical/ Functional |
| Specific zoning classification and description   Residential | | | Shape   Rectangular/ Functional |
| Zoning compliance ☑ Legal ☐ Legal nonconforming (Grandfathered use) ☐ Illegal ☐ No zoning | | | Drainage   Appears Adequate |
| Highest & best use as improved: ☑ Present use ☐ Other use (explain) | | | View   Residential |

| Utilities | Public | Other | Off-site improvements | Type | Public | Private | | |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☑ | 200 Amp Breakers | Street | Asphalt | ☑ | ☐ | Topography | Typical For Neighborhood |
| Gas | ☑ | Natural Gas | Curb/gutter | Concrete | ☑ | ☐ | Driveway Surface | Concrete |
| Water | ☑ | | Sidewalk | Concrete | ☑ | ☐ | Apparent easement | Typical Utility |
| Sanitary sewer | ☑ | | Street lights | Overhead Mercury Vapor | ☑ | ☐ | FEMA Special Flood Hazard Area | ☐ Yes ☑ No |
| Storm sewer | ☑ | | Alley | None | | | FEMA Zone X | Map Date 5/3/2004 |
| | | | | | | | FEMA Map No. 17167C0230E | |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): There were no apparent adverse easements or encroachments observed at the time of inspection. There are no known special assessments or zoning issues. The current use is considered the highest and best use of the subject property.

| GENERAL DESCRIPTION | EXTERIOR DESCRIPTION | FOUNDATION | BASEMENT | INSULATION |
|---|---|---|---|---|
| No. of Units 1 | Foundation Poured Conc. | Slab N/A | Area Sq. Ft. N/A | Roof Unk ☑ |
| No. of Stories 1 1/2 | Exterior Walls Vinyl/Ave | Crawl Space Yes | % Finished N/A | Ceiling Unk ☑ |
| Type (Det./Att.) Detached | Roof Surface Asphalt Shingle | Basement N/A | Ceiling Joist | Walls Avg ☑ |
| Design (Style) Tri-Level | Gutters & Dwnspts. Aluminum | Sump Pump Yes | Walls Concrete | Floor Unk ☑ |
| Existing/Proposed Existing | Window Type Double Hung | Dampness None Evident | Floor Concrete | None ☐ |
| Age (Yrs.) 25+/- | Storm/Screens Yes/ Yes | Settlement None Evident | Outside Entry No | Unknown ☐ |
| Effective Age (Yrs.) 20+/- | Manufactured House No | Infestation None Evident | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | N/A |
| Level 1 | | 1 | 1 | 1 | | | | 4 | 2.5 | 1 | 1 | 1,508 |
| Level 2 | | | | | | | | | | | | 756 |

Finished area above grade contains:   9 Rooms;   4 Bedroom(s);   2.5 Bath(s);   2,264 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|
| Floors | Hwd/Vinyl/Good | Type FWA | Refrigerator ☐ | None ☑ | Fireplace(s) # | None ☐ | | | |
| Walls | Dwl/Ave | Fuel Nat. Gas | Range/Oven ☐ | Stairs ☐ | Patio ☐ | Garage # of cars | | | |
| Trim/Finish | Stained/Ave | Condition Average | Disposal ☐ | Drop Stair ☐ | Deck Large Wood ☑ | Attached 2 | | | |
| Bath Floor | Vinyl/Good | COOLING | Dishwasher ☑ | Scuttle ☐ | Porch Covered ☑ | Detached | | | |
| Bath Wainscot | Fiberglass/Ave | Central Yes | Fan/Hood ☑ | Floor ☐ | Fence ☐ | Built-in | | | |
| Doors | 4 Panel/Ave | Other None | Microwave ☐ | Heated ☐ | Pool ☐ | Carport | | | |
| | | Condition Average | Washer/Dryer ☐ | Finished ☐ | | Driveway 2 | | | |

Additional features (special energy efficient items, etc.):   Any notable additional features not elsewhere addressed in the body of this report are discussed in the addendum section under the heading "Additional Features."

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.:   Physical depreciation is the result of normal wear and tear. No functional inadequacies were considered to exist in the subject's floor plan. No external obsolescence was considered to exist within the subject's neighborhood. Please see the addendum for further comments on this section of this report.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property:   See attached addenda.

Freddie Mac Form 70 6/93     PAGE 1 OF 2     Fannie Mae Form 1004 6/93

Form UA2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. 04062260 Page #4
0081183584
File No. 04062260

**Valuation Section**

| | | |
|---|---|---|
| ESTIMATED SITE VALUE …20000… = $ | 20,000 | Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property): Cost estimates were based on information gathered from the Marshall & Swift Cost Guide and/or interviews with local contractors. Please see the addenda for dimensions list and further comments. The driveway, sidewalk and landscaping, along with the well and septic systems where applicable, are included in the "As Is" Value of Site Improvements. |
| ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS: | | |
| Dwelling   2,264 Sq. Ft. @$   94.00   = $   212,816 | | |
|     Sq. Ft. @$   14.00   = | | |
|     = | | |
| Garage/Carport   576   Sq. Ft. @$   26.00   =   14,976 | | |
| Total Estimated Cost New ……………………… = $   227,792 | | |
| Less    Physical    Functional    External | | |
| Depreciation   70,092 |   70,092 | |
| Depreciated Value of Improvements ……………… = $   157,700 | | |
| "As-Is" Value of Site Improvements ……………… = $   6,000 | | |
| INDICATED VALUE BY COST APPROACH …………… = $   183,700 | | |

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 9 Hackney Ln<br>Springfield | 2733 Creslin<br>Springfield | | 2516 Harbauer Ln.<br>Springfield | | 2300 Silver Mill<br>Springfield | |
| Proximity to Subject | | 3.45 miles | | 1.15 miles | | 3.07 miles | |
| Sales Price | $ Refinance | $ | 184,000 | $ | 157,000 | $ | 187,000 |
| Price/Gross Living Area | $ | $ 76.67 | | $ 120.77 | | $ 82.02 | |
| Data and/or | Inspection | MLS | | MLS | | MLS | |
| Verification Source | Assessor | Assessor | | Assessor | | Assessor | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust | DESCRIPTION | +(−)$ Adjust | DESCRIPTION | +(−)$ Adjust |
| Sales or Financing Concessions | | Conventional<br>No Concessions | | Conventional<br>No Concessions | | Conventional<br>No Concessions | |
| Date of Sale/Time | | 02/27/2004 | | 03/17/2004 | | 02/13/2004 | |
| Location | Suburban/Ave. | Suburban/Ave. | | Suburban/Ave | | Suburban/Ave | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 1 Acre +/- | 70X135 | +3,000 | 94x120 | | 100x140 | |
| View | Residential/Ave | Residential/Ave | | Residential/Ave | | Residential/Ave | |
| Design and Appeal | Tri-Level | 2 Story/ Ave | | Bi-Level | | 2 Story/average | |
| Quality of Construction | Vinyl/Ave | Brick/Vinyl/Ave | | Brick/Vinyl/Ave | | Vinyl/Ave | |
| Age | 25+/- | 5+/- | −5,000 | 20+/- | | 25+/- | |
| Condition | Average | Average | | Average | | Average | |
| Above Grade | Total :Bdrms: Baths | Total :Bdrms: Baths | −2,000 | Total :Bdrms: Baths | | Total :Bdrms: Baths | |
| Room Count | 9 : 4 : 2.5 | 9 : 4 : 2 | +2,000 | 9 : 4 : 2.5 | | 9 : 4 : 2.5 | |
| Gross Living Area | 2,264 Sq.Ft. | 2,400 Sq. Ft. | −2,000 | 1,300 Sq. Ft. | +14,500 | 2,280 Sq. Ft. | 0 |
| Basement & Finished | Slab | Slab | | Full Basement | −4,000 | Slab | |
| Rooms Below Grade | N/A | N/A | | Mostly Finished | −10,000 | N/A | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FWA/ CA | FWA/CA | | FWA/CA | | FWA/CA | |
| Energy Efficient Items | Typical Items | Typical Items | | Typical Items | | Typical Items | |
| Garage/Carport | 2 Attached | 2 Attached | | 2 Attached | | 2 Attached | |
| Porch, Patio, Deck, Fireplace(s), etc. | Porch/Deck | Patio/Deck | | Patio/Deck | | Porch/Deck | |
| Fence, Pool, etc. | None | Fence | −1,000 | None | +1,000 | None | |
| Net Adj. (total) | | ☐+ ☒− $ | 5,000 | ☒+ ☐− $ | 500 | ☐+ ☐− $ | |
| Adjusted Sales Price of Comparable | | $ | 179,000 | $ | 157,500 | $ | 187,000 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): Market data obtained from the Multiple Listing Service and is assumed to be correct. The indicated value range by means of the Sales Comparison approach to value is $157,000- $187,000. The indicated sales were considered to be the best available within a reasonable proximity given the overall condition and physical characteristics of the subject property. The homeowner has put in a new central air-conditioning unit, a new Jacuzzi and has done much landscaping.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source, for prior sales within year of appraisal | 05/2003<br>136,900<br>Assessor | No Sales<br>Previous<br>One Year | No Sales<br>Previous<br>One Year | No Sales<br>Previous<br>One Year |

Analysis of any current agreement of sale, option, or listing of subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: Please see the Multi-Purpose Supplemental Addendum.

| | |
|---|---|
| INDICATED VALUE BY SALES COMPARISON APPROACH …………………………… $ | 172,000 |
| INDICATED VALUE BY INCOME APPROACH (If Applicable)   Estimated Market Rent $   N/A   /Mo. x Gross Rent Multiplier   N/A   = $ | |

This appraisal is made ☒ "as is"   ☐ subject to the repairs, alterations, inspections or conditions listed below   ☐ subject to completion per plans & specifications.
Conditions of Appraisal: See attached addenda.

Final Reconciliation: See attached addenda.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/FNMA Item 1004 B (Revised   06/1993   ).
I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF   06/03/2004
(WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $   172,000

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
|---|---|---|
| Signature | Signature | ☐ Did   ☐ Did Not |
| Name   Todd L. Lash | Name | Inspect Property |
| Date Report Signed   06/08/2004 | Date Report Signed | |
| State Certification #   156.0002960    State IL | State Certification #    State | |
| Or State License #    State | Or State License #    State | |

Form UA2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE



**Supplemental Addendum**                     File No. 04062260

| Borrower/Client | Benjamin Miller | | | |
|---|---|---|---|---|
| Property Address | 9 Hackney Ln | | | |
| City | Springfield | County | Sangamon | State | IL |
| Lender | Ameriquest | | | Zip Code | 62702-1508 |

- **Neighborhood Market Factors**

A typical neighborhood usually goes through four distinct periods in its life: growth, equilibrium (also called stability), decline and revitalization (also called rehabilitation). When an area is first developed, property values usually increase until few vacant building sites remain. At that point, the houses in the neighborhood tend to stabilize at their highest monetary value and prices rarely fluctuate downward. As the neighborhood increases in age and the presence of increasing property deterioration is evident, the area usually declines in both value and desirability. This process is enhanced by the availability of newer housing nearby. The neighborhood's life cycle may start over again due to revitalization-a period when demand increases due to the presence of certain favorable market and economic factors providing the stimuli for renewed consumer desirability for properties within the specified neighborhood. One of these factors is called gentrification. The phenomenon of gentrification is defined as the desirability that even run-down properties may have within a particular neighborhood if other favorable factors exist and are strong enough. These factors may include, but are not limited to, location and high demand, which are frequently found together in neighborhoods experiencing revitalization. Gentrification, then, only serves to strengthen the market appeal of neighborhoods in the stage of revitalization.

**Highest and Best Use**

The highest and best use analysis employed herein is based on the following:

Highest and best can be defined as the reasonably probable and legal use of vacant land or an improved property, that is physically possible, legally permissible, financially feasible, and that results in the highest value.

The present use is deemed to meet that test as of the effective date of the appraisal report.

- **Additional Features**

- **Adverse Environmental Conditions**

No environmental hazards or potential problems were noted by the appraiser at the time of inspection. The appraiser, however, is not an expert in the field of environmental hazards or toxic wastes, and makes no claims to possess such knowledge. It is the responsibility of the appraiser only to make note of and point out any obvious hazards or conditions. If the client has any questions, concerns or suspicions about the possible existence of any potentially hazardous conditions, then an expert in the field should be obtained to render a qualified opinion. Furthermore, the appraiser is not a qualified engineer or land surveyor and makes no claims to be. Any determination of flood zone location should be made by a qualified professional. If there are any questions regarding the exact location of any flood zone or zones, a qualified land surveyor should be retained for such an establishment.

- **Cost Approach Comments**

The Cost approach to value requires the appraiser to add the estimated value of the site to the depreciated value of the improvements. The site is valued as if vacant and available for its highest and best use. This value is obtained by using the extraction method. The appraiser has utilized the age-life method as a tool to estimate physical depreciation. This method assumes that physical deterioration occurs at a constant average annual rate. Functional obsolescence is defined as any defects in a building or structure that detract from its value or marketability, usually the result of layout, design or other features that are less desirable than features designed for the same functions in newer properties. Functional obsolescence may be curable or incurable. External obsolescence is any loss in value due to adverse factors outside the subject property and is generally considered to be incurable. Accrued depreciation is estimated by applying to a property's reproduction cost new the ratio of the property's effective age to its economic useful life. This estimate of the amount of accrued depreciation is achieved by calculating the difference between the estimate of reproduction cost new and the indicated value derived from the Sales Comparison Approach to value. This practise is commonly referred to as the indirect method for estimating accrued depreciation.

The Cost Approach to value carries the greatest measure of reliability when the subject improvements are new, there is no accrued depreciation and the land is being utilized at its highest and best use. The greater the amount of accrued depreciation, whether physical, functional or economic, the more subjective the Cost Approach to value becomes, and is, therefore, somewhat weakened in its measure of reliability. A substantial amount of accrued depreciation significantly reduces the measure of reliability.

- **Sales Comparison Comments**

The Sales Comparison Approach to value is based on the principle of substitution, which is illustrated by using sales of comparable properties as a basis for rendering an opinion as to the value of the subject property. The foremost consideration in choosing the sales to be used in the comparison is the circumstances surrounding the sale of the comparable properties. The type and location of comparables used in this approach are then dependent on the nature and type of the property being appraised.

The appraiser used great care in an effort to bracket the sales price of the subject with that of the comparable sales. However, in



## Supplemental Addendum

File No. 04062260

| Borrower/Client | Benjamin Miller | | | |
|---|---|---|---|---|
| Property Address | 9 Hackney Ln | | | |
| City Springfield | | County Sangamon | State IL | Zip Code 62702-1508 |
| Lender Ameriquest | | | | |

some sub-markets of smaller population based communities, such as the subject's, where sales data is limited, it is not unusual to encounter a situation where the subject's sales price is unable to be bracketed within the scope of the comparison.

The appraiser's approach to comparable sales selection includes effort and great care given to utilizing data that is within the typical parameter of a ratio range of $10 per square foot. The ratio is ascertained by dividing the sales price by gross living area. Within smaller population based communities, such as the subject's, where sales data is limited, it is not unusual for this ratio to be exceeded.

Due to the volume of sales activity of communities from within a limited population base, and given the overall condition and physical characteristics of the subject property, it was necessary to utilize sales from outside the subject's defined neighborhood boundaries. Consideration was given to sales data from within competing neighborhoods of similar predominant values and physical characteristics to that of the subject's neighborhood.

The appraiser's approach in selecting comparable sales is to compile and utilize sales data within 6 months of the effective date of this report. As it becomes necessary to exceed a 6 month time frame, the appraiser then considers past market conditions of the comparable sale(s) in relation to the present conditions which exist as of the effective date of this report in an effort to determine market variances within the scope of the comparison. However, as no significant changes in economic forces have occurred within this time period, no adjustments for varying market conditions are deemed appropriate.

The location of all the sales was compared to that of the subject in regards to neighborhood predominant values, proximity to employment, parks, shopping and other amenities, proximity to commercial and/or industrial properties, proximity to high traffic thoroughfares, and any variance(s) in the market that may exist. Appropriate dollar adjustments, if any, were considered.

The property rights included with the subject property were compared to the property rights included within the comparable sales. These estate rights are most often referred to as Fee Simple or Fee Simple Absolute. Fee simple is the highest or most complete form of ownership today. Fee simple ownership includes the right to use the land now and for an indefinite period of time in the future. These rights of ownership, often called the bundle of rights, include the rights to use, rent, sell or give away the real estate, as well as to choose not to exercise any of these rights. The bundle of rights inherent in the ownership of real estate are what may be bought and sold in a real property transaction. In an appraisal the rights being appraised must be stated, because any limitation on the rights of ownership may affect property value.

Site adjustments, if any, were made according to site value and not necessarily to site size.

The view from the subject was compared to that of the sales. Consideration was given to any factors that could possibly affect market values within the scope of the comparison. Such factors may include, but are not limited to, wooded areas or scenic views of rivers, lakes or valleys (etc.), or views of residential, industrial or commercial properties (etc.) that could require adjustment consideration in regards to possible variances in market value.

The design and appeal of all the sales were compared to that of the subject's. Consideration was given to each comparison in regards to current trends in design and appeal which seem to have a bearing on a property's market value. Areas of consideration may include, but are not limited to, the building style of the dwelling, the visual appearance of the property from the street, and the layout and floor plan of the home itself in relation to modern desires which exist in the market place. In regards to the floor plans involved in each comparison, information is utilized from the appraiser's personal knowledge of the property and/or MLS data.

The quality of construction of all the sales was compared to that of the subject's. Appropriate adjustments, if any, were made in regards to the exterior building material's maintenance free characteristics, the quality of the material(s) in regards to contemporary standards, and its overall acceptance and desirability within the subject's sub-market. As to the interior, consideration is given to the quality of building and finishing materials present, such as various types of floor coverings, i.e. ceramic, slate, and/or the grade of carpeting, the quality of the various fixtures in the home, the appeal and quality of the kitchen, baths, etc. To arrive at appropriate adjustment figures, the appraiser utilized information obtained from the Multiple Listing Service, personal knowledge of the comparable properties, and/or information obtained from a reliable source, such as the property owner, builder, real estate agent, etc.

The actual age of all the sales was compared to that of the subject's. In some instances, appropriate dollar adjustments are realized upon a determination that the reflected age difference has a bearing on market value within the scope of the comparison.

The over all condition of the sales was compared to that of the subject. Consideration was given to the extent of internal and/or external renovating, remodeling and/or updating, and observed deferred maintenance. In regards to the subject property, the quality of workmanship and products used in any improvements were also taken into consideration. In respect to the comparable sales, the appraiser utilized information obtained from the Multiple Listing Service, personal knowledge of the comparable properties, and/or information obtained from a reliable source, such as the property owner, real estate agent, etc., to arrive at appropriate adjustment figures.

The gross living area, along with the bedroom and bathroom counts of all the sales was compared to that of the subject's and appropriate dollar adjustments were made accordingly. The appraiser used great care in an effort to bracket the gross living area of the subject with that of the comparable sales. However, within smaller population based communities, such as the subject's,



## Supplemental Addendum

| | | | File No. 04062260 |
|---|---|---|---|
| Borrower/Client | Benjamin Miller | | |
| Property Address | 9 Hackney Ln | | |
| City Springfield | County Sangamon | State IL | Zip Code 62702-1508 |
| Lender Ameriquest | | | |

where sales data is limited, it is not unusual to encounter a situation where the gross living area is unable to be bracketed within the scope of the comparison.

The basements of all the sales were compared to that of the subject's. In some cases, appropriate dollar adjustments have been considered. These adjustments were determined upon an analysis of the overall basement size, the kind and type of rooms below grade, and the overall square footage of finished area below grade.

Functional utility refers to a dwelling's overall compatibility with its intended use and environment, as defined by market standards. This category includes design features, such as layout, room size, storage area, security and privacy that are in line with current trends in the market area. Consideration is given to circumstances such as tandem bedrooms or bedrooms immediately off a living or dining room, a bathroom that is immediately off the kitchen or absent from a second story where the bedrooms are located. Adjustments are necessary only when such factors are present and the appraiser deems that the presence of such factors creates a difference in marketability within the scope of the comparison of the properties.

The type of heating and air conditioning of all the sales was compared to that of the subject's and appropriate dollar adjustments, if any, were made accordingly.

The garages of all the sales were compared to that of the subject's. The determination of any dollar adjustment was based on the size, type, quality of construction, amenities, and the proximity of the garage to its respective property dwelling.

The amenities of all the sales were compared to that of the subject's. These amenities may include, but are not limited to, the size and type of porches (whether they are open, covered or enclosed), the size, materials and design of decks and patios, the length and type of fences, the shape, size and design of in-ground pools, and the size, materials and type of any outbuildings or storage sheds that may be present. Appropriate dollar adjustments were made accordingly.

The "Built - Ins" of all the sales were compared to that of the subject's. These may include, but are not limited to, dishwashers, range/ovens and microwaves that are "built - in". However, these features are considered to provide minimal contributory value towards the final valuation. Therefore, no adjustments are considered in the comparison of these features.

The appraiser has taken great care to utilize sales data that conforms to typical adjustment standards. However, when appraising properties in areas of a smaller population base where appropriate comparable sales data may be limited, it is not unusual for gross adjustments to exceed 25% and/or net adjustments to exceed 15%, land-to-value ratios to exceed 15% and/or line adjustments to exceed 10%. When one or more of these conditions exist within the scope of the comparison, it is the normal and accepted practice of this appraiser, where at all possible, to utilize 4 -6 comparable sale selections to further support the appraiser's opinion of value and to further assist the appraiser's client towards the purpose for which this appraisal was requested.

• Conditions of Appraisal
This is a Complete Appraisal Report written in a Summary Format which is intended to comply with the reporting requirements set forth under Standards Rule 2 - 2(b) of the Uniform Standards of Professional Appraisal Practice for a Summary Appraisal Report. As such, it represents only summary discussions of the data, reasoning and analyses that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation that is not provided within the report concerning the data, reasoning and analyses is retained in the appraiser's file. The depth of the discussion contained in this report is specific to the needs of the client and for the intended use stated in the report. The appraiser is not responsible for unauthorized use of this report.

This appraisal report may contain an electronic signature(s). Electronic signatures were implemented for the convenience of this firm and at our clients' requests. Electronic signatures are individually password protected.

This appraisal report may contain Multiple Listing Service photographs. In the event that MLS photos have been utilized, the appraiser certifies that he/she has driven by the property and that the comparable photos used are accurate representations of the comparable sale as of the effective date of this appraisal.

The Date of the Report is the date the report was signed.

• Final Reconciliation
Greatest emphasis was placed on the results of the Sales Comparison approach to value as it best indicates the activity of buyers and sellers in the market place. The Cost approach supports the Sales Comparison approach and usually indicates the upper range of value. The Income approach was considered but not deemed applicable to this appraisal report, as there is insufficient market rent data with which to develop a Gross Rent Multiplier.



**Subject Photo Page**

| Borrower/Client | Benjamin Miller | | | | |
|---|---|---|---|---|---|
| Property Address | 9 Hackney La | | | | |
| City | Springfield | County | Sangamon | State | IL | Zip Code | 62702-1508 |
| Lender | Ameriquest | | | | |



**Subject Front**

9 Hackney Ln
| | |
|---|---|
| Sales Price | Refinance |
| Gross Living Area | 2,264 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.5 |
| Location | Suburban/Ave |
| View | Residential/Ave |
| Site | 1 Acre +/- |
| Quality | Vinyl/Ave |
| Age | 25+/- |



**Subject Rear**



**Subject Street**

Form PIC3x5.SR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE



## Subject Photograph Addendum

| Borrower/Client | Benjamin Miller | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 0 Hackney Ln | | | | | | |
| City | Springfield | | County Sangamon | | State IL | | Zip Code 62702-1508 |
| Lender | Ameriquest | | | | | | |







## Comparable Photo Page

| | | | | |
|---|---|---|---|---|
| Borrower/Client | Benjamin Miller | | | |
| Property Address | 9 Hackney Ln | | | |
| City Springfield | | County Sangamon | State IL | Zip Code 62702-1508 |
| Lender Ameriquest | | | | |



### Comparable 1
2733 Cronin

| | |
|---|---|
| Prox. to Subject | 3.45 miles |
| Sale Price | 184,000 |
| Gross Living Area | 2,400 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 2 |
| Location | Suburban/Ave |
| View | Residential/Ave |
| Site | 70X135 |
| Quality | Brick/Vinyl/Ave |
| Age | 5+/- |



### Comparable 2
2516 Harbaur La.

| | |
|---|---|
| Prox. to Subject | 1.15 miles |
| Sale Price | 157,000 |
| Gross Living Area | 1,300 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.5 |
| Location | Suburban/Ave |
| View | Residential/Ave |
| Site | 94x120 |
| Quality | Brick/Vinyl/Ave |
| Age | 20+/- |

© 2004 Capital Area MLS

### Comparable 3
2300 Silver Mill

| | |
|---|---|
| Prox. to Subject | 3.07 miles |
| Sale Price | 187,000 |
| Gross Living Area | 2,280 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.5 |
| Location | Suburban/Ave |
| View | Residential/Ave |
| Site | 100x140 |
| Quality | Vinyl/Ave |
| Age | 25+/- |

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

www.epicappraisalservices.com
Form ACR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 040672260| Page #12

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:**  9 Hackney Ln, Springfield, IL 62702-1508

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: | Signature: |
| Name: Todd L Lash | Name: |
| Date Signed: 06/08/2004 | Date Signed: |
| State Certification #: 156.0002960 | State Certification #: |
| or State License #: | or State License #: |
| State: IL | State: |
| Expiration Date of Certification or License: 9/30/2005 | Expiration Date of Certification or License: |
| | ☐ Did   ☐ Did Not Inspect Property |

**Location Map**


File No. 04062260  Page #13

| Borrower/Client | Benjamin Miller | | | | |
|---|---|---|---|---|---|
| Property Address | 9 Hackney Ln | | | | |
| City | Springfield | County | Sangamon | State IL | Zip Code 62702-1508 |
| Lender | Ameriquest | | | | |



Amy L Huber

018/022







**Flood Map**

File No. 0408226D | Page #15

| | | | | |
|---|---|---|---|---|
| Borrower/Client  Benjamin Miller | | | | |
| Property Address  9 Hackney Ln | | | | |
| City  Springfield | County  Sangamon | | State  IL | Zip Code  62702-1508 |
| Lender  Ameriquest | | | | |





File No. 04062260  Page #18

| Borrower Benjamin Miller | | | | File No. 04062260 |
|---|---|---|---|---|
| Property Address 9 Hackney Ln | | | | |
| City Springfield | County Sangamon | | State IL | Zip Code 62702-1508 |
| Lender Ameriquest | | | | |

## APPRAISAL AND REPORT IDENTIFICATION

This appraisal conforms to one of the following definitions:

☒ Complete Appraisal    (The act or process of estimating value, or an opinion of value, performed without invoking the Departure Rule.)

☐ Limited Appraisal    (The act or process of estimating value, or an opinion of value, performed under and resulting from invoking the Departure Rule.)

This report is one of the following types:

☐ Self-Contained    (A written report prepared under Standards Rule 2-2(a) of a Complete or Limited Appraisal performed under STANDARD 1.)

☒ Summary    (A written report prepared under Standards Rule 2-2(b) of a Complete or Limited Appraisal performed under STANDARD 1.)

☐ Restricted    (A written report prepared under Standards Rule 2-2(c) of a Complete or Limited Appraisal performed under STANDARD 1, restricted to the stated intended use by the specified client or intended user.)

### Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:

☐ The statements of fact contained in this report are true and correct.

☐ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions and conclusions.

☐ I have no (or the specified) present or prospective interest in the property that is the subject of this report, and no (or the specified) personal interest with respect to the parties involved.

☐ I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.

☐ My engagement in this assignment was not contingent upon developing or reporting predetermined results.

☐ My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

☐ My analyses, opinions and conclusions were developed and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

☐ I have (or have not) made a personal inspection of the property that is the subject of this report.

☐ No one provided significant real property appraisal assistance to the person signing this certification. (If there are exceptions, the name of each individual providing significant real property appraisal assistance must be stated.)

### Comments on Appraisal and Report Identification

Note any departures from Standards Rules 1-5 and 1-4, plus any USPAP-related issues requiring disclosure:

This is a Complete Appraisal Report written in a Summary format. The Departure Provision under USPAP guidelines has not been invoked.

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: _Todd L. Lesh_ | Signature: _____ |
| Name: Todd L. Lesh | Name: _____ |
| Date Signed: 06/08/2004 | Date Signed: _____ |
| State Certification #: 156.0002960 | State Certification #: _____ |
| or State License #: _____ | or State License #: _____ |
| State: IL | State: _____ |
| Expiration Date of Certification or License: 9/30/2005 | Expiration Date of Certification or License: _____ |
| | ☐ Did ☐ Did Not  Inspect Property |



File No. 060622-30   Page #17

## MULTI-PURPOSE SUPPLEMENTAL ADDENDUM
## FOR FEDERALLY RELATED TRANSACTIONS

www.spicappraisalservices.com

Borrower/Client  Benjamin Miller
Property Address  9 Hackney Ln
City  Springfield     County  Sangamon     State  IL     Zip Code  62702-1508
Lender  Ameriquest

This Multi-Purpose Supplemental Addendum for Federally Related Transactions was designed to provide the appraiser with a convenient way to comply with the current appraisal standards and requirements of the Federal Deposit Insurance Corporation (FDIC), the Office of the Comptroller of Currency (OCC), The Office of Thrift Supervision (OTS), the Resolution Trust Corporation (RTC), and the Federal Reserve.

> This Multi-Purpose Supplemental Addendum is for use with any appraisal.  Only those statements which have been checked by the appraiser apply to the property being appraised.

### ☒ PURPOSE & FUNCTION OF APPRAISAL

The purpose of the appraisal is to estimate the market value of the subject property as defined herein.  The function of the appraisal is to assist the above-named Lender in evaluating the subject property for lending purposes.  This is a federally related transaction.

### ☒ EXTENT OF APPRAISAL PROCESS

☒ The appraisal is based on the information gathered by the appraiser from public records, other identified sources, inspection of the subject property and neighborhood, and selection of comparable sales within the subject market area.  The original source of the comparables is shown in the Data Source section of the market grid along with the source of confirmation, if available.  The original source is presented first.  The sources and data are considered reliable.  When conflicting information was provided, the source deemed most reliable has been used.  Data believed to be unreliable was not included in the report nor used as a basis for the value conclusion.

☐ The Reproduction Cost is based on _____
supplemented by the appraiser's knowledge of the local market.

☒ Physical depreciation is based on the estimated effective age of the subject property.  Functional and/or external depreciation, if present, is specifically addressed in the appraisal report or other addenda.  In estimating the site value, the appraiser has relied on personal knowledge of the local market.  This knowledge is based on prior and/or current analysis of site sales and/or abstraction of site values from sales of improved properties.

☒ The subject property is located in an area of primarily owner-occupied single family residences and the Income Approach is not considered to be meaningful.  For this reason, the Income Approach was not used.

☐ The Estimated Market Rent and Gross Rent Multiplier utilized in the Income Approach are based on the appraiser's knowledge of the subject market area.  The rental knowledge is based on prior and/or current rental rate surveys of residential properties.  The Gross Rent Multiplier is based on prior and/or current analysis of prices and market rents for residential properties.

☐ For income producing properties, actual rents, vacancies and expenses have been reported and analyzed.  They have been used to project future rents, vacancies and expenses.

### ☐ SUBJECT PROPERTY OFFERING INFORMATION

According to  the subject property owner                                    the subject property:
☒ has not been offered for sale in the past  ☐ 30 days  ☐ 1 year  ☒ 3 years.
☐ is currently offered for sale for $
☐ was offered for sale within the past  ☐ 30 days  ☐ 1 year  ☐ 3 years  for $ _____
☐ Offering information was considered in the final reconciliation of value.
☐ Offering information was not considered in the final reconciliation of value.
☐ Offering information was not available.  The reasons for unavailability and the steps taken by the appraiser are explained later in this addendum.

### ☒ SALES HISTORY OF SUBJECT PROPERTY

According to  the county assessment records                                    the subject property:
☒ Has not transferred  ☐ in the past twelve months.  ☒ in the past thirty-six months.  ☐ in the past 5 years.
☐ Has transferred  ☐ in the past twelve months.  ☐ in the past thirty-six months.  ☐ in the past 5 years.
☐ All prior sales which have occurred in the past  are listed below and reconciled to the appraised value, either in the body of the report or in the addenda.

| Date | Sales Price | Document # | Seller | Buyer |
|------|-------------|------------|--------|-------|
|      |             |            |        |       |
|      |             |            |        |       |
|      |             |            |        |       |

### ☒ FEMA FLOOD HAZARD DATA

☒ Subject property is not located in a FEMA Special Flood Hazard Area.
☐ Subject property is located in a FEMA Special Flood Hazard Area.

| Zone | FEMA Map/Panel # | Map Date | Name of Community |
|------|------------------|----------|-------------------|
| X | 17167C0230B | 5/3/2004 | |

☐ The community does not participate in the National Flood Insurance Program.
☐ The community does participate in the National Flood Insurance Program.
☐ It is covered by a regular program.
☐ It is covered by an emergency program.

Form MPA3 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE




File No. 04062280 Page #18

---

☒ **CURRENT SALES CONTRACT**

☒ The subject property is currently not under contract.
☐ The contract and/or escrow instructions were not available for review. The unavailability of the contract is explained later in the addenda section.

☐ The contract and/or escrow instructions were reviewed. The following summarizes the contract:

| Contract Date | Amendment Date | Contract Price | Seller |
|---|---|---|---|
| | | | |

☐ The contract indicated that personal property was not included in the sale.
☐ The contract indicated that personal property was included. It consisted of _____
    Estimated contributory value is $ _____
☐ Personal property was not included in the final value estimate.
☐ Personal property was included in the final value estimate.
☐ The contract indicated no financing concessions or other incentives.
☐ The contract indicated the following concessions or incentives: _____

☐ If concessions or incentives exist, the comparables were checked for similar concessions and appropriate adjustments were made, if applicable, so that the final value conclusion is in compliance with the Market Value defined herein.

☒ **MARKET OVERVIEW**    Include an explanation of current market conditions and trends.

_3 - 6_ months is considered a reasonable marketing period for the subject property based on _data collected and analyzed from the local_ M.L.S.

☒ **ADDITIONAL CERTIFICATION**

The Appraiser certifies and agrees that:

(1) The analyses, opinions and conclusions were developed, and this report was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice ("USPAP"), except that the Departure Provision of the USPAP does not apply.
(2) Their compensation is not contingent upon the reporting of predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.
(3) This appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

☒ **ADDITIONAL (ENVIRONMENTAL) LIMITING CONDITIONS**

The value estimated is based on the assumption that the property is not negatively affected by the existence of hazardous substances or detrimental environmental conditions unless otherwise stated in this report. The appraiser is not an expert in the identification of hazardous substances or detrimental environmental conditions. The appraiser's routine inspection of and inquiries about the subject property did not develop any information that indicated any apparent significant hazardous substances or detrimental environmental conditions which would affect the property negatively unless otherwise stated in this report. It is possible that tests and inspections made by a qualified hazardous substance and environmental expert would reveal the existence of hazardous substances or detrimental environmental conditions on or around the property that would negatively affect its value.

☐ **ADDITIONAL COMMENTS**

---

☐ **APPRAISER'S SIGNATURE & LICENSE/CERTIFICATION**

Appraiser's Signature _____    Effective Date _06/03/2004_    Date Prepared _06/08/2004_
Appraiser's Name (print) _Todd L. Lash_    Phone # _815-224-7443_
State _IL_    ☒ License    ☐ Certification #    _156.0002960_    Tax ID #

☒ **CO-SIGNING APPRAISER'S CERTIFICATION**

☒ The co-signing appraiser has personally inspected the subject property, both inside and out, and has made an exterior inspection of all comparable sales listed in this report. The report was prepared by the appraiser under direct supervision of the co-signing appraiser. The co-signing appraiser accepts responsibility for the contents of this report including the value conclusions and the limiting conditions, and confirms that the certifications apply fully to the co-signing appraiser.
☐ The co-signing appraiser has not personally inspected the interior of the subject property and:
    ☐ has not inspected the exterior of the subject property and all comparable sales listed in the report.
    ☐ has inspected the exterior of the subject property and all comparable sales listed in the report.
☐ The report was prepared by the appraiser under direct supervision of the co-signing appraiser. The co-signing appraiser accepts responsibility for the contents of the report, including the value conclusions and the limiting conditions, and confirms that the certifications apply fully to the co-signing appraiser with the exception of the certification regarding physical inspections. The above describes the level of inspection performed by the co-signing appraiser.
☐ The co-signing appraiser's level of inspection, involvement in the appraisal process and certification are covered elsewhere in the addenda section of this appraisal.

☒ **CO-SIGNING APPRAISER'S SIGNATURE & LICENSE/CERTIFICATION**

Co-Signing Appraiser's Signature _____    Effective Date _____    Date Prepared _____
Co-Signing Appraiser's Name (print) _____    Phone # _____
State _____    ☐ License    ☒ Certification # _____    Tax ID # _____

Page 2 of 2

# EXHIBIT A

## STATEMENT OF CREDIT DENIAL, TERMINATION, OR CHANGE

| | |
|---|---|
| Applicant(s): (Type Full Name and Address)<br>Benjamin Miller | Description of Account, Transaction or Requested Credit:<br>0001265205    REFINANCE |
| | Date:    June 7, 2006 |
| 9 Hackney Ln<br>Springfield, IL   62702<br>Description of Action Taken:    Denied | |

**PART I.**    Principal reason(s) for credit denial, termination or other action taken concerning credit. In compliance with Regulation "B" (Equal Credit Opportunity Act), you are advised that your recent application for credit has been declined/terminated/changed. The decision to deny/terminate/change your application was based on the following reason(s):

**A. CREDIT**
- [ ] No Credit File
- [ ] Insufficient Number of Credit References Provided
- [ ] Insufficient Credit File
- [ ] Limited Credit Experience
- [ ] Unable to Verify Credit References
- [ ] Garnishment, Attachment, Foreclosure, Repossession, Collection Action or Judgment
- [ ] Excessive Obligations in Relation to Income
  - [ ] Unacceptable Payment Record on Previous Mortgage
  - [ ] Lack of Cash Reserves
- [ ] Delinquent Past or Present Credit Obligations with Others
- [ ] Bankruptcy Past or Present
- [ ] Unacceptable Type of Credit References Provided
- [ ] Poor Credit Performance with Us

**B. EMPLOYMENT STATUS**
- [ ] Unable to Verify Employment
- [ ] Length of Employment
- [ ] Temporary or Irregular Employment

**C. INCOME**
- [ ] Insufficient Income for Amount of Credit Requested
- [ ] Unable to Verify Income
- [ ] Excessive Obligations in Relation to Income

**D. RESIDENCY**
- [ ] Temporary Residence
- [ ] Length of Residence
- [ ] Unable to Verify Residence

**E. INSURANCE, GUARANTY or PURCHASE DENIED BY:**
- [ ] Department of Housing and Urban Development
- [ ] Department of Veterans Affairs
- [ ] Federal National Mortgage Association
- [ ] Federal Home Loan Mortgage Corporation
- [ ]

**F. OTHER**
- [ ] Insufficient Funds to Close the Loan
- [ ] Credit Application Incomplete
- [ ] Value or Type of Collateral not Sufficient
  - [ ] Unacceptable Property
  - [ ] Insufficient Data - Property
  - [XX] Unacceptable Appraisal
  - [ ] Unacceptable Leasehold Estate
- [ ] We do not grant credit to any applicant on the terms and conditions you have requested. _____
- [XX] appraised value too low
  (LTV is 132%)

**You have the right to a copy of the appraisal report used in connection with your application for credit. If you wish a copy, please write to us at the mailing address we have provided. We must hear from you no later than 90 days after we notify you about the action taken on your credit application or you withdraw your application.**

**PART II.**    Disclosure of use of information obtained from an outside source.

- [X] Our credit decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below. You have a right under the Fair Credit Reporting Act to know the information contained in your credit file at the consumer reporting agency. The reporting agency played no part in our decision and is unable to supply specific reasons why we have denied credit to you. You also have a right to a free copy of your report from the reporting agency, if you request it no later than 60 days after you receive this notice. In addition, if you find that any information contained in the report you receive is inaccurate or incomplete, you have the right to dispute the matter with the reporting agency.

| | |
|---|---|
| Name: | Equifax Information Svc. LLC |
| Address | 6 E. Clementon Rd. |
| | Gibbsboro, NJ   08026 |
| Telephone Number: | 800-333-0037 | or Toll Free Number: |

- [ ] Our credit decision was based in whole or in part on information obtained from an affiliate or from an outside source other than a consumer reporting agency. Under the Fair Credit Reporting Act, you have the right to make a written request, no later than 60 days after you receive this notice, for disclosure of the nature of this information.

If you have any questions regarding this notice, you should contact:

| | |
|---|---|
| Creditor's Name: | American Home Mortgage |
| Creditor's Address: | 538 Broadhollow Rd |
| | Melville, NY   11747 |
| Creditor's Telephone Number: | 269-684-2060 |

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is the    Federal Trade Commission
                    Equal Credit Opportunity
                    Washington, DC   20580
Should you have any additional information which might assist us in evaluating your creditworthiness, please let us know.
Thank you for applying.

                    American Home Mortgage
                    (Lender)

# EXHIBIT K

**EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.**
**120 S. LaSalle Street, 18th floor**
**Chicago, Illinois 60603-3403**
**(312) 739-4200**
**(800) 644-4673**
**(312) 419-0379 (FAX)**
**Email: edcombs@aol.com**
**www.edcombs.com**

November 20, 2006

**BY CERTIFIED MAIL**

Ameriquest Mortgage Company
c/o registered agent
National Registered Agents, Inc.
200 W. Adams
Chicago, IL 60606

AMC Mortgage Services, Inc.
c/o registered agent
National Registered Agents, Inc.
200 W. Adams
Chicago, IL 60606

Ameriquest Mortgage Securities, Inc.
1100 Town & Country Road, Suite 1100
Orange, CA 92868

      Re:    Notice of rescission, claim and lien, Benjamin Miller, Katherine Miller, 9 Hackney Lane, Springfield, IL 67202, loan of June 30, 2004

Ladies/Gentlemen:

      Each of the above clients hereby give notice that they rescind the above loan for noncompliance with the Truth in Lending Act.

      Please be further advised that we have been retained by the above clients to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

      If you claim that the owner of the loan is other than Ameriquest Mortgage Company or Ameriquest Mortgage Securities, Inc., please identify the owner pursuant to 15 U.S.C. §1641(d).

I, Daniel A. Edelman, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addressees on November 20, 2006.

_____
Daniel A. Edelman